# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED
United States District Court
Las Cruces, New Mexico
Erik Paltrow
Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
La Quinta Inn, 790 Avenida de Mesilla, Room 103, Las Cruces, New Mexico (The Subject Premises)

Case No. **26-1776 MR**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and fully incorporated herein.

located in the ______ District of New Mexico, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Possession with intent to distribute a controlled substance and conspiracy. |

The application is based on these facts:

See Attachment C, which is attached and fully incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Francis Whitten
*Applicant's signature*

Francis Whitten, DEA Special Agent
*Printed name and title*

**VIA PHONE and SIGNED ELECTRONICALLY**

Sworn to ~~before me and signed in my presence~~.

Date: **8/26/26**

*Judge's signature*

City and state: Las Cruces, New Mexico

Honorable Damian L. Martinez, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

*Property to be searched*

The property to be searched is 790 Avenida de Mesilla, Room 103, Las Cruces, New Mexico, hereinafter "the Subject Premises," further described as **single interior hotel room with the numeric "103" to the left of the door, located on the first floor near the south west corner within a large hotel building.**



The search of the above-described Subject Premises shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the Subject Premises, and all vehicles and persons located on the Subject Premises in or on which the items to be seized could be concealed.

# ATTACHMENT B

*Property to be seized*

All evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841 and 21 U.S.C. § 846 involving William Clay Miller and occurring between July of 2025 to Present, specifically:

I. Property to be Seized from the Subject Premises

1) Controlled substances, including fentanyl, methamphetamine, heroin, cocaine, and marijuana;
2) Firearms, firearm accessories, ammunition, machineguns, destructive devices, and body armor;
3) Items of value that reasonably appear to be the proceeds of drug transactions, such as large amounts of currency, financial instruments, and jewelry;
4) Controlled substance trafficking paraphernalia, such as hidden compartments, scales, plastic bags, heat sealing devices, dilutants, and binding agents;
5) Lists of drug customers, suppliers, and other drug trafficking associates, including records containing their aliases, telephone numbers, addresses, and messaging/social media usernames, as well as quantities of controlled substances bought and sold, and sums of money paid or owed;
6) Documents related to the manufacture and distribution of controlled substances;
7) Communications between drug traffickers and their co-conspirators;
8) Financial documents related to income from drug trafficking and the expenditures of drug proceeds, such as financial technology firm (e.g. CashApp) records, bank records, money orders, wire transfer records, tax records, safe deposit box records, checkbooks,

and documents showing the use of business entities to disguise drug trafficking proceeds;

9) Items that tend to indicate ownership or control of the Subject Premises, including utility bills, rental agreements, leases, identification documents, and keys;

10) Items that tend to indicate ownership or control over any vehicles located at the Subject Premises, including titles, registrations, gas receipts, repair bills, and vehicle keys;

11) Travel records related to drug trafficking, such as airline tickets, credit card receipts, and rental car information;

12) Photographs or videos of drug traffickers, their co-conspirators, their firearms, and property or assets purchased with drug proceeds; and

13) Mobile phones, tablets, digital cameras, and digital video surveillance systems (collectively, "Devices") that reasonably appear to contain evidence, fruits, and instrumentalities of violations of the statutes listed above, as further described in Section II below.

During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the Subject Premises and reasonably believed by law enforcement to be a user of a Device found at the Subject Premises, to the fingerprint scanner of that Device; and/or (2) hold a Device found at the premises in front of the face of that same individual and activate the facial recognition feature, for the purpose of attempting to unlock the Device in order to search the contents as authorized by this warrant. Agents shall select the finger(s) or thumb(s) of the individual, rather than requiring the person to choose.

## II. Information to be Seized from Devices

For any Device whose seizure is otherwise authorized by this warrant:

1) Photographs and videos of any of the categories of evidence listed in Section I(1)-(12) of this Attachment;
2) Communications and documents related to any of the categories of evidence listed in Section I(1)-(12) of this Attachment; and
3) Evidence of who used, owned, or controlled the Device at the times the things described herein were created, edited, deleted, or saved such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, contacts, instant messaging logs, photographs, and correspondence.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>**La Quinta Inn, 790 Avenida de Mesilla, Room 103, Las Cruces, New Mexico** | Case No. **26-1776 MR** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Francis Whitten, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as La Quinta Inn, 790 Avenida de Mesilla, Room 103, Las Cruces, New Mexico, hereinafter "the Subject Premises," further described in Attachment A, for the things described in Attachment B.

2. I am a Special Agent of the Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been employed with the DEA since December 2025. Prior to joining the DEA, I was employed with The City of Las Cruces Police Department, New Mexico from September 2016 until December of 2025. During that time, I worked as a patrol officer for approximately eight years. During my career as a DEA agent, I have conducted criminal investigations concerning violations of the Controlled Substances Act and have received ongoing training in conducting such investigations. My training and experience as a Special Agent includes, but is not limited to: conducting physical surveillance; interviewing witnesses; writing affidavits for and executing search warrants; working with undercover agents and

informants; issuing administrative subpoenas; analyzing financial records, telephone records, and data derived from the use of pen registers, trap and traces, and wiretaps.

3. I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl. Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with Drug Enforcement Administration (DEA), and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities of William Clay Miller, and others ("the Subjects").

4. I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

a. Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the DEA, and other law enforcement officials (collectively referred to as "agents"), including oral and written reports that I have received directly or indirectly from said investigators;

b. Results of physical surveillance conducted by agents during the investigation;

c. A review of telephone toll records and subscriber information;

d. A review of driver's license and automobile registration records;

e. Records from commercial databases; and

f. Records from the National Crime Information Center ("NCIC").

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION**

6. I believe there is probable cause that William Clay Miller has committed, is committing, and will continue to commit offenses involving violations of, *inter alia*:

a. 21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances;

b. 21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances;

**EVIDENCE SOUGHT DURING SEARCH**

7. Based on my training, experience and participation in this and in similar investigations, I believe the following:

a. individuals involved in illegal trafficking of controlled substances ("drug traffickers") often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence,

which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

b. Drug traffickers often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

c. Drug Traffickers commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, film canisters, and heat-sealing devices); scales to weigh controlled substances; and dilutants and binding agents to manufacture or "cut" controlled substances. Drug traffickers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

d. Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of

business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the drug trafficker by customers and by the trafficker to his/her suppliers.

e. Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

f. Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage

rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

g. Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

h. Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

i. Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and

businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

j. Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on financial technology firm (such as CashApp) records, banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages,

outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

k. The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

l. Drug traffickers frequently use more than one digital device to conduct their business. The use of different devices may help traffickers escape law enforcement attention, by ensuring that one phone number does not appear too often in databases, or limiting the scope of evidence that can be obtained from a single

source. Many drug traffickers often use different telephones for different sets of co-conspirators: for example, a phone for suppliers and another phone for customers.

m. Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

n. Drug traffickers often maintain firearms, ammunition, destructive devices, and other weapons on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as accessories, receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

o. Weapons (including rifles, shotguns, handguns, and machineguns) and destructive devices are tools of the trade for drug traffickers, who often keep firearms and similar weapons in close proximity to themselves, and their product and proceeds, to protect themselves, their drug supplies, and their drug proceeds from other drug traffickers and law enforcement. Similarly, drug traffickers frequently possess

body armor to protect themselves during armed conflict with other traffickers or law enforcement.

p. Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

q. Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker’s drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal

activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

r. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

8. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

9. A list of items agents seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

10. As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subject Premises, including in digital form. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B). These facts may be true even if substantial time has elapsed between the date of the crime and the date of the search.

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition,

a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

11. *Necessity of seizing or copying entire electronic media.* In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it

requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

12. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

13. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called “Touch ID,” which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device’s Touch ID sensor, which is found in the round button (often referred to as the “home” button) located at the bottom center of the front of the device. The fingerprint sensors found on devices

produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be

able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the

device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**PROBABLE CAUSE**

14. August of 2024, agents began an investigation into William Clay Miller for fentanyl and methamphetamine distribution in Las Cruces, NM. Agent conducted six controlled purchases between August of 2024 till January of 2025 from Miller at various locations. January 29th, 2025, agents conducted a traffic stop of Miller and was found in the possession of 24.7 gross grams of fentanyl pills, 2.01 gross grams of methamphetamine, and approximately $8,000 cash. On November 18, 2025, Miller was granted 18 months of supervised probation.

15. On August 25, 2026, during a post arrest interview of a subject agents learned that Miller is currently residing at 790 Avenida De Mesilla (La Quinta Inn) room 103 (herein after referred to as the Subject Premises) in Las Cruces, NM. Agents were informed that Miller is currently known to be in possession of large quantities of fentanyl powder and methamphetamine inside the Subject Premises as recently as August 22, 2026, when she purchased user quantities. The subject provided Miller's phone number (575-543-9611) and showed a couple messages from purchasing controlled substances. During this interview, a photo of Miller was shown to the subject who confirmed his identity by acknowledging him as "weasel" which is Millers moniker. The subscriber for the above listed phone number through T-Mobile is William Miller.

16. During the post arrest interview, agents learned that Miller provides powder fentanyl to anyone who walks up to his room, number 103, and there is an open trade of narcotics throughout the Subject Premises. The large quantities of fentanyl described in the post arrest interview were described as mason jars full of fentanyl powder that Miller would pull the powder from and distribute it in the quantities requested for the specific sale Miller was conducting.

17. Miller's criminal history consists of multiple charges of trafficking-controlled substances and possession of a controlled substance along with probation violations and violent offences such as Aggravated Assault with a Deadly Weapon. Miller is on probation through New Mexico Adult Probation and Parole for Possession of Controlled Substance.

18. There have been several calls for service and arrests made at La Quinta based on investigations conducted by local law enforcement and other federal partners. Search and arrest warrants were served at the location in numerous rooms in July of 2026.

19. On August 26, 2026, agents conducted a dry meet to purchase powder fentanyl utilizing an undercover agent (UCA) at the Subject Premises. The UCA proceeded to the room 103's door, knocked and met with Miller. While the UCA was meeting with Miller they observed a basket full of cut up foil tickets that were stacked on top of one another, some cut up straws nearby the foil basket and a lighter that is consistent with narcotics usage and distribution. The UCA also observed a variety of large jars on the table in close proximity to the foil, straws and lighter which is consistent with the information gathered from the post arrest interview. Miller refused to sell to the UCA and stated, "I can't sell to you man, I don't know you". I believe based on my training, knowledge, and experience the basket full of cut "foil tickets" is used to smoke fentanyl. Furthermore, I believe that the cut up straws are utilized to snort the powder fentanyl in the Subject Premises before the purchasers leave the room.

20. Based on my knowledge, experience and training, the operation that Miller is running in the Subject Premises is consistent with how local drug distributors operate. Miller has an area in the Subject Premises that is ready to distribute narcotics from, or an area for narcotics usage prior to Miller allowing the purchasers to leave the room.

21. Based on knowledge provided by local narcotics agents, I know that drug distributors residing at La Quinta typically keep/store their drugs, money, and firearms in different rooms than the one they are selling the narcotics out of. The additional rooms that they have assigned to them allow them to maintain control over the items and protect them because of their high value. I know that that drug distributors generally don't have buyers come to their residence to purchase the drugs because of the unwanted attention and traffic that is a result of the continuous sales, which is why they are utilizing multiple rooms to store and hold their firearms, narcotics and

currency. I know that drug distributors are often armed with firearms for their own protection and protection of the high valued drugs.

## CONCLUSION

22. I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Francis Whitten

Francis Whitten
Special Agent
Drug Enforcement Administration

Electronically signed and telephonically sworn
on August 26, 2026:

Damian L Martinez

Honorable Damian L. Martinez
UNITED STATES MAGISTRATE JUDGE